OLNEY SAVINGS & LOAN ASSOCIATION, Plaintiff–Appellee
Cross–Appellant,

v.

TRINITY BANC SAVINGS ASSOCIATION, etc., et al., Defendants,

Bright Banc Savings Association f/k/a Trinity Savings & Loan Association, Trinity Banc Savings Association, and Bright Mortgage Co., f/k/a STM Mortgage Company, Defendants–Appellants Cross–Appellees.

No. 88–1842.

United States Court of Appeals, Fifth Circuit.

Oct. 10, 1989.

---

61. 52 Fed.Reg. 42,542–43.

F. Franklin Honea, Payne & Vendig, Dallas, Tex., for defendants-appellants cross-appellees.

Robert J. Clary, Johnson, Bromberg & Leeds, Dallas, Tex., for intervenor FSLIC.

William Reid, E. Eldridge Goins, Jr., Dallas, Tex., additional counsel on plea in intervention.

Before GARZA, REAVLEY and POLITZ, Circuit Judges.

GARZA, Circuit Judge:

Olney Savings & Loan Association ("Olney") obtained a judgment for rescission of a loan participation, plus actual and punitive damages, against Bright Banc Savings Association, formerly Trinity Savings & Loan Association and Trinity Banc Savings Association ("Trinity"), and Bright Mortgage Company, formerly STM Mortgage Company ("STM"). Trinity is now under conservatorship of the Federal Savings and Loan Insurance Corporation ("FSLIC"). Trinity and STM appeal on sufficiency of the evidence grounds from the district court's judgment, which was based on the jury's finding of fraud; FSLIC, who intervened as conservator during the pendancy of this appeal, now asserts statutory and sovereign immunity defenses that were not available to Trinity and STM at trial. We affirm the judgment of the trial court.

In early 1982, townhouse developers Third Aquarius Corporation, with Bob Pritchett and Curtis Baggett, conceived a plan through which they would find lenders to finance the purchase of townhouses for certain buyers, who would then immediately deed the properties back to the developers. Using that plan, the developers could indirectly finance the purchases at a time when they themselves could not finance directly. Trinity financed a package of twenty loans, and Olney agreed to purchase a 90% participation in most of those loans through a Loan Participation Agreement and letter of commitment. Within a short period of time, virtually all of the loans were in default, and STM as loan servicer foreclosed on the properties. Trinity bought the properties at full loan value so there was no possibility of obtaining a deficiency judgment against the buyers.

Olney then sued Trinity and STM for rescission of the loan contracts and damages. Olney alleged that Trinity and STM, agents for each other at the time they were negotiating Olney's participation in the loans, misrepresented to Olney, among other things, that (1) the buyers would make down payments, which they did not do; (2) that one-half of the buyers would themselves occupy the townhouses, which was not so; and (3) that the townhouses were in good repair, and they were not. Indeed, Trinity and STM's in-house appraiser affirmed that the townhouses were constructed "below average" and were "not in good condition."

At trial, the court submitted to the jury questions on fraud, negligent misrepresen-

tation, breach of contract, negligence in foreclosure, and negligence in performance of the Participation Agreement; the jury found in favor of Olney on each issue.[1] Based on the jury's affirmative finding of fraud, Olney elected rescission as its remedy, and the district court correctly entered judgment for Olney in the amount of $507,226.03 to effect the rescission, plus $300,000 in punitive damages, jointly and severally against Trinity and STM.

From that judgment Trinity and STM now appeal, complaining that: first, the district court erred in granting rescission because the court did not submit jury questions on the defense of ratification; second, the court erred in submitting a general fraud question which listed multiple fraud issues, when one or more of the fraud issues was not supported by the evidence; and finally, there was insufficient evidence to support the jury's verdict and the court's judgment on the issues of fraud, negligent misrepresentation, and their causation of damages.[2]

After the district court entered its final judgment and Trinity and STM had posted a supersedeas bond and otherwise perfected their appeal, FSLIC stepped in as conservator for the insolvent Trinity. FSLIC complains, for the first time on appeal, that sovereign immunity prohibits assessment of punitive damages here as FSLIC is an instrumentality of the United States, and that the *D'Oench* doctrine, codified at 12 U.S.C. § 1823(e), can be raised at this time and serve as a complete defense to Olney's claims as the Participation Agreement is an invalid "secret agreement." FSLIC further asserts that it is a holder in due course of the Participation Agreement, and that

Olney is not entitled to rescission as Olney suffered no tort injury separate from the breach of contract.[3]

## I. Trinity and STM Claims

### A. *Rescission and Ratification*

The district court entered a judgment for rescission in favor of Olney based on the jury's finding of fraud and misrepresentation. The jury also found that Olney had not by its conduct waived any right to sue.[4] Trinity and STM complain now that the court erred in not submitting a question specifically on the issue of ratification, because Olney would not be entitled to rescission of a contract it had ratified.

 Under Texas law, ratification occurs "when a person induced by fraud to enter into an agreement continues to accept benefits under the agreement after he becomes aware of the fraud, or if he conducts himself so as to recognize the agreement as binding." *Johnson v. Smith*, 697 S.W.2d 625 (Tex.App.—Houston [14th Dist.] 1985, no writ); *Sawyer v. Pierce*, 580 S.W.2d 117 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.). The essential elements of ratification parallel those in the court's definition of waiver; that is, knowledge, and intentional conduct inconsistent with a right to rescind. Conduct on Olney's part that would have triggered an affirmative response on a ratification question would have done so on the submitted waiver question as well. For that reason, we find that the district court's submission of the waiver question in this instance satisfied Trinity and STM's request for a ratification question, and affirm the district court on this point.

1. The court also submitted questions based on third-party claims by Trinity and STM against R.B. Pritchett and First American Title Company. Those claims are not before us, and we will not address them.

2. Because we affirm the district court's actions as far as necessary to support the rescission, we do not reach Trinity and STM's points of error regarding the measure of damages for breach of contract, and the manner of submission of negligence and contract issues. Any opinion rendered on those issues would be purely advisory, as the jury's finding of fraud and the absence of

ratification are sufficient to uphold the judgment of rescission.

3. For the reasons stated in note 2, above, we do not reach FSLIC's complaint that Trinity and STM were not negligent as a matter of law, and that the jury's answers are in conflict on the issue of damages.

4. The court's charge defined "waiver" as the "intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right."

## B. *General Fraud Question*

■ The district court's charge to the jury set out eleven separate claims of fraud and misrepresentation, and instructed the jury to consider only those claims in answering the question on fraud and negligent misrepresentation. The court then asked simply:

Did Olney prove by a preponderance of the evidence that Trinity or STM, either

| | | | |
|---|---|---|---|
| ANSWER: | | Trinity | STM |
| (a) Fraud | | _____ | _____ |
| (b) Negligent | | | |
| Misrepresentation | | _____ | _____ |

directly or through their agent or alter ego, made fraudulent representations or negligent misrepresentations to Olney before the purchase and funding of the 17 loans?

Answer either "Olney did prove" or "Olney did not prove" as to each defendant.

The jury answered "Olney did prove" to each component of this question, both as to Trinity and STM. Trinity and STM complain now that the district court erred in submitting the question in this broad form, and allege that, because there was insufficient evidence to support several of the claims, this case must be remanded for a new trial.

It is true that "when a case is submitted to the jury on a general verdict, the failure of evidence or a legal mistake under one theory of the case generally requires reversal for a new trial because the reviewing court cannot determine whether the jury based its verdict on a sound or unsound theory." *Pan Eastern Exploration Co. v. Hufo Oils*, 855 F.2d 1106, 1123 (5th Cir. 1988); *Nowell ex rel. Nowell v. Universal Electric Co.*, 792 F.2d 1310, 1312 (5th Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986); *Ward v. Succession of Freeman*, 854 F.2d 780, 790 (5th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct.2064, 104 L.Ed.2d 629 (1989). The result is different, however, when the reviewing court can be "reasonably certain that the jury did not base its verdict on an unsound theory." *Braun v. Flynt*, 731 F.2d 1205, 1206 (5th Cir.), *cert. denied sub. nom, Chic Magazine v. Braun*, 469 U.S. 883, 105 S.Ct. 252, 83 L.Ed.2d 189 (1984). So, if any one of the district court's list of claims were not supported by evidence or in some other way unsound, we would be bound to remand this cause for a new trial, absent evidence that the jury did not base its

verdict on that unsound claim. But we need not do so today, because each claim was properly submitted and supported by the evidence, as is discussed below. Trinity and STM's complaint on this point must, therefore, fail.

## C. *Sufficiency of the Evidence*

As stated above, the district court set out a list of claims of fraud and misrepresentation, and the jury was asked whether Trinity and STM had committed the acts, and whether those acts proximately caused Olney's damages. The jury answered all questions in the affirmative. Trinity and STM now complain that the evidence was insufficient to support the verdict on virtually each and every one of those points, and insufficient to support an affirmative finding of causation. Our standard for reviewing a sufficiency of the evidence point is to view the evidence in the light most favorable to the verdict, and to grant the benefit of all reasonable inferences from the evidence. *Boeing Co. v. Shipman*, 411 F.2d 365, 375 (5th Cir.1969). Given that standard, and Trinity and STM's broad claims on appeal, we must now address those claims Trinity and STM allege are not supported.

### 1. Down Payments

■ The court's charge included a claim that Trinity and STM had misrepresented to Olney whether the buyers had made down payments.[5] It is undisputed that the buyers had made no down pay-

---

5. Shirley Kessler, President of Olney, testified at trial that buyers who make down payments are less likely to default, as the payment is incentive to keep the loan current.

ments, so the issue is whether Trinity and STM represented otherwise. At trial, STM Vice–President Fred Vanderwoude testified that he forwarded sales contracts to Olney which specifically recited down payments were made, and that he sent them with the intention that Olney rely on them. It is of no consequence that STM did not actually prepare the contracts, since a misrepresentation in Texas can consist of conduct manifesting to another the existence of a fact, and need not be a direct assertion. *Custom Leasing, Inc. v. Texas Bank & Trust Co.*, 516 S.W.2d 138, 142 (Tex.1974). We find sufficient evidence on this point and affirm.

### 2. Loan Limits

The court's charge included a claim that Trinity and STM had represented that they would not fund loans in excess of legal limits; that is, "loan to purchase price" ratios would be maintained.[6] The Earnest Money Contracts used in connection with the loans specified that $42,500 was the purchase price, but each contract noted that a down payment was made, and the loan amount was therefore something less than $42,500. Because the down payments had not actually been made, the loan amount was, in reality, the purchase price. The "loan to purchase price" ratios were not maintained.

■ Trinity and STM make much of the fact that, while they represented that they would maintain "loan to value" ratios, they never did so for "loan to purchase price" ratios. Therefore, they argue, the court's instruction as to "loan to purchase price" is not supported by the evidence. But this claim must fail. Here, the purchase price of the units equalled the value as assessed by Mr. Hoffman, the appraiser hired by the developers, so a ratio maintained to one would equal the ratio maintained to the other. Further, a trial judge has wide discretion in wording jury instructions, and the instruction here adequately explained Olney's claim and did not mislead the jury.

*Keyes v. Lauga*, 635 F.2d 330, 333 (5th Cir.1981); *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 300 (5th Cir.1978). We find sufficient evidence on this point and affirm.

### 3. Owner Occupancy

The court's charge also alleged that Trinity and STM had represented that one-half of the units would be owner-occupied. Shirley Kessler, President of Olney, testified that Trinity and STM had made that representation, and that the piecemeal presentation of the loan applications made Olney's calculation of owner-occupancy impossible. We find sufficient evidence on this point and affirm.

### 4. Investigating Borrowers

The court's charge included a claim that Trinity and STM had misrepresented that the buyers would be investigated. At trial, there was summarized deposition testimony from the buyers that neither Trinity nor STM had contacted them to verify information given in their loan applications. Further, Joyce Qusenberry, an STM employee, testified that although her name was used to approve each loan, she did not contact all applicants to verify the applications, nor could she be sure which applicants her assistant had contacted. Verification, too, was especially necessary as the loan applications were prepared and delivered by the *sellers* of the properties, an unusual occurrence. We find sufficient evidence on this point and affirm.

### 5. Condition of Townhouses

The court's charge included a claim that Trinity and STM had misrepresented that the townhouses would be in good condition. Although the appraisal reports given to Olney did in part represent that the townhouses were in "average" condition, taken as a whole, the appraisals showed the townhouses to be in good condition. In fact, former Olney President Charles Jones testified at trial that they were not in good

---

**6.** Those ratios were 95% of purchase price for owner-occupied units and 80% of purchase price for investor-owned units.

condition, but Olney did not know that until after funding the loans. We find sufficient evidence on this point.

### 6. Accurate Appraisals

■ The court's charge included a claim that Trinity and STM misrepresented that the townhouse appraisals—upon which Olney was expected to rely—were accurate. While Trinity and STM never expressly told Olney that the appraisals were accurate, they transmitted the inaccurate appraisals with the knowledge and intention that Olney would rely on them. And it is clear that conduct of that sort can constitute a representation. *See Custom Leasing, Inc. v. Texas Bank & Trust Co.*, 516 S.W.2d 138, 142 (Tex.1974). We dismiss as meritless Trinity and STM's argument that, since an appraisal is an opinion, it cannot be false just because it is inaccurate, and affirm on this point.

### 7. Concealed Material Facts

■ The charge included a claim that Trinity and STM had concealed the fact that all of the loans would be in the same project and that other loans in that same project were already in default. Though the jury had conflicting evidence on the issue of the loans being in one project, Shirley Kessler's testimony that Trinity and STM never disclosed that fact is sufficient to sustain the jury's verdict. As for the other loans being in default, Trinity and STM argue that, although STM was servicing agent on those loans and knew they were in default, it acquired that knowledge while acting as agent for another lender and not as agent for Trinity. Therefore, knowledge of default should not be imputed to Trinity. This claim must fail, as there was ample evidence at trial from Joyce Qusenberry that employees of STM did work for Trinity, that they were "owned by the same people," and in general that the boundaries of each organization were blurred. We find sufficient evidence on this point and affirm.

### D. Causation

■ Trinity and STM complain now that there was no evidence that any of their alleged misrepresentations or omissions were a cause in fact of Olney's damages. They argue that their misrepresentations to Olney[7] did not affect the market value of the townhouse units themselves, and therefore did not cause Olney's losses. This argument is fundamentally flawed, because while the misrepresentations did not affect the actual market value of the real estate, they certainly affected Olney's participation in and funding of the loans, and certainly Olney relied on them.

In Texas, the elements of fraud "consist of a misrepresentation of a material fact with the intention to induce action or inaction, and reliance on the misrepresentation by a person who, *as a result of such reliance*, suffers injury." *Chaffin v. Transamerica Insurance Co.*, 731 S.W.2d 728, 732 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.) (emphasis added); 41 Tex. Jur.3d Fraud & Deceit 7 (1985). Olney President Shirley Kessler testified that Olney relied on the misrepresentations, and that but for them, would not have funded the loans. Undoubtedly, Olney was injured by that reliance, as it entered into a loan agreement fraught with inaccurate appraisals, uninvestigated borrowers, self-dealing developers, unpaid down payments, and "below average" real estate. We find sufficient evidence of causation, and affirm.

## II. FSLIC's Claims

### A. Punitive Damages

■ The district court awarded Olney $300,000 in punitive damages. FSLIC now complains the doctrine of sovereign immunity should void that award, as FSLIC is an agency of the United States. Generally, agencies of the United States cannot be held liable for punitive damages absent Congressional authorization. *Missouri Pacific R.R. Co. v. Ault*, 256 U.S. 554, 563–564, 41 S.Ct. 593, 597, 65 L.Ed. 1087, 1092 (1921); *Smith v. Russellville Credit Assoc.*, 777 F.2d 1544, 1549–50 (11th

---

**7.** Those misrepresentations are discussed in Section C, above.

Cir.1985); *Painter v. Tennessee Valley Authority*, 476 F.2d 943, 944 (5th Cir.1973). But here, the punitive damages were not levied against the FSLIC, but against Trinity and STM, who are not agencies of the United States, and consequently do not fall under the umbrella of sovereign immunity.

Trinity and STM posted a supersedeas bond to stay execution of the judgment against them while pursuing their appeal. When they posted that bond, the funds ceased to be assets of Trinity or STM, and therefore the funds are not under FSLIC's control as conservator. A similar situation arose in *Grubb v. Federal Deposit Ins. Corp.*, 833 F.2d 222 (10th Cir.1987). In that case, the plaintiff prevailed in their suit against the defendant bank. The bank appealed the judgment and posted a supersedeas bond to stay execution. During the appeal, the Federal Deposit Insurance Corp. ("FDIC") took over the bank as receiver, and sought return of the funds posted as bond because ordinarily, agencies of the United States need not post bond on appeal. But in *Grubb*, since the bond had been posted before FDIC stepped in as receiver, FDIC was not entitled to a release of the bond, because those funds were not "part of the assets available for ratable distribution." *Grubb*, 833 F.2d at 226. In our case, the bond posted by Trinity and STM is no longer part of the assets available to FSLIC for distribution; therefore, its use as punitive damages does not tax an agency of the United States nor offend sovereign immunity.

FSLIC argues that awarding punitive damages against an association in conservatorship "would not punish the Bank, but its innocent creditors and uninsured depositors," quoting *Professional Asset Management v. Penn. Square Bank, N.A.*, 566 F.Supp. 134 (W.D.Okla.1983); *Summers v. Federal Deposit Ins. Corp.*, 592 F.Supp. 1240 (W.D.Okla.1984). But those cases are inapposite, as there the receiver stepped in before trial and judgment, and punitive damages would have been drawn from assets available for distribution by the receiver. We therefore affirm the district court's award of punitive damages.

### B. D'Oench *Defense*

FSLIC complains now that it has a complete defense to the Participation Agreement's contemporaneous side agreements under the rule of *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), codified and expanded at 12 U.S.C. § 1823(e).[8] Though § 1823(e) has not been extended to protect the FSLIC, the *D'Oench* doctrine has. *Federal Savings and Loan Ins. Corp. v. Murray*, 853 F.2d 1251, 1254 (5th Cir.1988). As the aims of § 1823(e) and *D'Oench* are identical and § 1823(e) is a codification of *D'Oench* and its progeny, the reasoning applied in § 1823(e) cases is applicable to *D'Oench* cases.

 The *D'Oench* doctrine invalidates secret agreements that would adversely affect FSLIC's rights under a facially valid instrument. FSLIC argues that Trinity and STM's misrepresentations are secret agreements under *D'Oench* as they tend to diminish or defeat FSLIC's rights under the Participation Agreement.[9] Therefore,

---

**8.** Title 12 U.S.C. § 1823(e) provides in full:

No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the Board of Directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, contin-

uously, from the time of its execution, an official record of the bank.

**9.** In *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), the Supreme Court held that fraudulent misrepresentations, such as the ones made in this case, can constitute "agreements" under § 1823(e). In *Langley*, a bank made fraudulent misrepresentations about some land to a couple borrowing money to buy that land. The FDIC, as receiver of the later-failed bank, sued the couple for non-payment of the loan. The couple asserted fraud as a defense, and the Supreme Court held that the bank's fraudulent misrepresentations were "agreements" under § 1823(e). Therefore, the couple

FSLIC argues that it should take the Participation Agreement free of those misrepresentations. But this argument must fail. Even though the misrepresentations fall within the *D'Oench* definition of "secret agreement," FSLIC acquired no asset when it stepped in as conservator. Because the Participation Agreement had been voided by the entry of judgment for rescission, FSLIC acquired no right, title or interest that could be diminished or defeated by the misrepresentations. *See Langley*, 108 S.Ct. at 402–403 (defense that renders instrument entirely void, as opposed to merely voidable, takes instrument out of the protection of § 1823(e)); *Grubb v. Federal Deposit Ins. Corp.*, 868 F.2d 1151, 1158 (10th Cir.1989) (instrument voided by entry of a judgment does not constitute a "right, title or interest" if acquired later by receiver).

Further, because a final judgment existed when FSLIC entered as conservator, the purposes of *D'Oench* and § 1823(e) will not be impaired. One purpose is to prevent "fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." *Langley*, 108 S.Ct. at 401. Here, as in *Grubb*, 868 F.2d at 1159, "collusion between [the parties] seems highly unlikely because the parties had fully and heatedly litigated the ... issue to judgment before the bank failed."

▆▆▆ FSLIC argues that, under Section 212 of the newly-enacted Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), which was signed by the President on August 9, 1989, they are entitled to raise § 1823(e) on appeal. The relevant section, which amends and restates 12 U.S.C. § 1821, provides:

"(B) Rights and remedies of Conservator or Receiver—In the event of any appealable judgment, the Corporation as conservator or receiver shall—

(i) have all the rights and remedies available to the insured depository institution (before the appointment of such conservator or receiver) and the Corporation in its corporate capacity, including removal to Federal court and all appellate rights ..."

Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, § 212, 103 Stat. 183, 222 (1989).

FSLIC argues that this new provision allows conservators to raise § 1823(e) on appeal for the first time, after the entry of a final judgment to which they were not a party. We read the same section, and find that it means that conservators and receivers are given standing to pursue all appeals, where before its enactment only FDIC acting in its corporate capacity could pursue certain claims. This section gives FSLIC no new substantive rights in this appeal.

### C. *Holder in Due Course*

▆▆▆ The FSLIC argues that, when it acquired the Participation Agreement, it did so with the status of a holder in due course, and therefore it takes free of Olney's misrepresentation defenses. Holders in due course take instruments free of competing claims and personal defenses, but subject to real defenses that render the instrument void rather than merely voidable. U.C.C. § 3–305; White & Summers, Uniform Commercial Code § 14–9 (1980). Since FSLIC took the Participation Agreement at a time when it was void because of the judgment, FSLIC does not take the Agreement free and clear. Because the Agreement is void, and would not be enforceable by any holder in due course, we see no need to discuss whether FSLIC would have qualified as a holder in due course.

### D. *Tort Injury*

▆▆▆ FSLIC complains that, since Olney's losses were purely economic, Olney suffered no tort as a matter of law. There-

---

could not assert the misrepresentations to defeat FDIC's rights under the facially valid loan contract. This court has held that misrepresentations can also constitute secret agreements under *D'Oench*. *Murray*, 853 F.2d at 1255. But

as is discussed above, the misrepresentations' status as secret agreements, taken alone, is not sufficient to let FSLIC take the Participation Agreement free and clear.

fore, FSLIC argues, rescission is not proper as it was based on the jury's finding of fraud. FSLIC cites as authority numerous cases which stand for the proposition that there is no cause of action in tort when "the injury is only the economic loss to the subject of the contract itself." *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986); *Allen v. Allen*, 751 S.W.2d 567 (Tex.App.—Houston [14th Dist.] 1988, writ denied); *Arkwright–Boston Manufacturers Mutual Ins. Co. v. Westinghouse Electric Corp.*, 844 F.2d 1174, 1184 (5th Cir. 1988).

In the case before us, the fraud occurred not in the *performance* of the contract, but in its *inducement*. FSLIC's cases are for that reason inapposite. "Fraud in the inducement is fatal to a contract. One induced by fraud may stand to the bargain and recover damages for the fraud or he may rescind." *L & B Oil Co., Inc. v. Arnold*, 620 S.W.2d 191, 193 (Tex.Civ.App. —Waco 1981, writ dism'd w.o.j.); *Polar Bear Ice Cream Co., Inc. v. Earhart*, 603 S.W.2d 388 (Tex.Civ.App.—Waco 1980, writ dism'd, w.o.j.). We therefore affirm the district court's judgment on this point.

III. Conclusion

Because FSLIC took over as conservator at a time when judgment had been entered by the district court, and the Participation Agreement was thereby rendered void, FSLIC had no greater rights in this appeal than Trinity and STM would have. For this reason and the reasons stated above, the judgment of the district court is in all things AFFIRMED.