Gordon L. MILLIGAN, Jr. and Barbara Milligan, Plaintiffs,

v.

GILMORE MEYER INCORPORATED, Preston Gilmore Construction Co., Inc., Preston Gilmore Homes, Inc., E. Craig Meyer, L. Preston Gilmore, Resolution Trust Corporation as Receiver for North Carolina Savings & Loan Association, F.A., and NCF Mortgage Company, d/b/a Prime Lending, Inc., William W. Shearhouse, Jr., Friedman, Haslam, Weiner, Ginsberg, Shearhouse & Weitz, now known as Weiner, Shearhouse, Weitz, Greenberg & Shawe, Cora Bett Thomas and Meddin Gilmore, Inc., Defendants.

No. CV 490–272.

United States District Court, S.D. Georgia, Savannah Division.

Oct. 3, 1991.

Melanie L. Marks, Paul W. Painter, Jr., Savannah, Ga., John T. McGoldrick, Jr. (Shearhouse, Weiner), John C. Daniel, III, Martin, Snow, Grant & Napier, Macon, Ga., Alex L. Zipperer, Savannah, Ga., for plaintiffs.

Sam P. Inglesby, Jr., Dorothy W. Courington, Thomas A. Nash, Jr., Inglesby, Falligant, Horne, Courington & Nash, P.C., John Stephen Lewis, Backmann & Lewis, James L. Coursey, Weiner, Ginsberg, Shearhouse & Weitz, Ralph R. Lorberbaum, Savannah, Ga., for defendants.

### ORDER

EDENFIELD, Chief Judge.

Before the Court is the motion of the defendant, Resolution Trust Corporation ("RTC"), for summary judgment based on the federal common law's *D'Oench, Duhme* doctrine and 12 U.S.C. § 1823(e) (1988). As explained below, the Court agrees with RTC's position and GRANTS summary judgment in its favor. Also pending is the motion for summary judgment of the defendants William W. Shearhouse Jr. and Friedman, Haslam, Weiner, Ginsberg, Shearhouse & Weitz, now known as Weiner, Shearhouse, Weitz, Greenberg & Shawe ("the Weiner firm"). Because this Court's jurisdiction was based on RTC's special grant of jurisdiction and removal powers, *see* 12 U.S.C.A. § 1441a (*1*)(1)–(3) (West Supp.1990), the Court lacks jurisdiction over the Plaintiffs' claims against the remaining parties. Therefore the Court REMANDS the Plaintiffs' claims against all parties other than RTC to the Superior Court of Chatham County, Georgia. Accordingly, the Court will not consider the motion of William Shearhouse, Jr. and the Weiner firm.

### BACKGROUND

The following facts are taken from the briefs of the parties and the statements required by Local Rule 6.6. In 1987, Cora Bett Thomas, a real estate broker for Meddin/Gilmore Inc., approached the Plaintiffs, Gordon and Barbara Milligan ("the Milligans"), and Gordon Milligan's mother, Mary Theresa Milligan, about the sale of their adjoining residences on Stephenson Avenue in Savannah, Georgia. Thomas' client, Gilmore Meyer Incorporated ("GMI"), wished to develop the Milligans' property, Mary Theresa Milligan's property, and the adjacent land for commercial use.

The Milligans negotiated a transaction with GMI, in which they agreed to sell their property and Mary Theresa Milligan's property to GMI for a total sum $360,000. To avoid adverse tax consequences, the Milligans, with the help of GMI's accountant, structured a fairly complex transaction. In return for the sale of their Stephenson Avenue property to GMI for $142,500.00, the Milligans agreed that GMI would purchase and construct a residence for them for $131,700.00. GMI also bought Mary Theresa Milligan's home, and all parties to the transaction agreed to allocate the remaining portion of the $360,000 total pur-

chase price to Mary Theresa Milligan so she could purchase a replacement home. The Milligans picked out a lot in a subdivision located in Savannah, Georgia ("the Waubun Woods property").

The closing for the sale of the Stephenson Avenue properties was held on March 25, 1988. William J. Shearhouse, Jr., a Savannah attorney, was GMI's closing attorney. The Milligans' received a $131,700 credit against the purchase price GMI paid Milligan for the Stephenson Avenue property. At the closing, the Milligans entered into a real estate contract for the purchase of the Waubun Woods property with GMI. The contract, a standard form document, provided that GMI had good and marketable title to the property, that the Plaintiff had paid $131,700.00 to GMI, and that this money would be placed in GMI's escrow account. At the time the Milligans and GMI entered into the contract, GMI did not have legal title to the Waubun Woods property. GMI had an executory contract for the purchase of the Waubun Woods property with Mary B. Burkhalter, the prior record owner of the property.

GMI never acquired title to the property. Instead, on April 25, 1988, Preston Gilmore Construction Company Inc. ("PGCCI"), a related company, obtained title to the Waubun Woods property from Mary B. Burkhalter. Almost immediately, PGCCI signed a promissory note ("the PGCCI note") and obtained a construction loan of $105,600.00 from NCF Mortgage Company, d/b/a Prime Lending, Inc. ("NCF Mortgage"), a subsidiary of North Carolina Savings & Loan Association, F.A. ("NCSLA") to construct a residence on the Waubun Woods property ("the PGCCI security deed"). As collateral, PGCCI gave NCF Mortgage a deed to secure debt on the Waubun Woods property. NCF Mortgage recorded this deed in the Office of the Clerk of Superior Court of Chatham County. Although NCF Mortgage's closing instruction designate Shearhouse as the closing agent, Jeffrey Rubnitz, an attorney in the same law firm as Shearhouse, actually closed the construction loan transaction.

After the Milligans took possession, they learned that they did not have record title to the property. The Milligans brought an action for specific performance and damages in Chatham County Superior Court on September 28, 1989, against GMI, PGCCI, L. Preston Gilmore, and E. Craig Meyer. On March 1, 1990, RTC was appointed Conservator for NCSLA. NCF Mortgage assigned the PGCCI security deed and promissory note to NCSLA on June 29, 1990. NCSLA recorded this assignment of the PGCCI security deed.

Subsequently, PGCCI defaulted on the loan. In August 1990, RTC, acting as Conservator for NCSLA began to advertise to foreclose on the security deed. On August 30, 1990, the Milligans filed an amended complaint in state court, adding NCF Mortgage, NCSLA, and RTC as defendants, and seeking to prevent RTC from foreclosing on the security deed. On the same day, Judge Eugene H. Gadsen of Chatham County Superior Court granted a temporary restraining order. (*See* Exhibit B to Notice of Removal to United States District Court for Southern District of Georgia, Savannah Division).

On September 20, 1990, RTC, who had previously been the Conservator for NCSLA, became the Receiver for that institution. RTC removed the case to this Court under the removal provisions of Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. 101–73, 103 Stat. 183 (1989), now codified as 12 U.S.C. § 1441a(*l*)(3). On July 18, 1991, RTC filed a motion for summary judgment based on the federal common law's *D'Oench, Duhme* doctrine and 12 U.S.C. § 1823(e) (1988).

### ANALYSIS

#### I. *Summary Judgment*

The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56 advisory committee's note). The Court "must

determine whether there is any genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law." *Warren v. Crawford*, 927 F.2d 559, 561 (11th Cir.1991); *Regan v. United States Small Business Admin.*, 926 F.2d 1078, 1080 (11th Cir.1991) (both citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). Thus, summary judgment is appropriate where the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The substantive law governing the action determines whether an element is essential. *E.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1505 (11th Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991). The movant typically must discharge this burden by producing evidence that negates an essential element of the nonmovant's claim. *E.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In some circumstances, however, the movant may meet this burden by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Coats & Clark*, 929 F.2d at 608; *see Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552.

Only after the movant successfully discharges this initial burden, does the burden shift to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. *Thompson v. Metropolitan Multi–List, Inc.*, 934 F.2d 1566, 1583 n. 16 (11th Cir.1991); *see Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir.1987). "Factual disputes that are irrelevant or unnecessary will not be counted." *United States v. Gilbert*, 920 F.2d 878, 883 (11th Cir.1991) (citation omitted). The nonmovant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514; *Gilbert*, 920 F.2d at 882. This means that the nonmovant "must set forth specific facts showing that there is a genuine need for trial." *Johns v. Jarrard*, 927 F.2d 551, 555 (11th Cir.1991) (citation omitted).

In assessing whether the movant is entitled to summary judgment in its favor, the district court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. *E.g., Regan*, 926 F.2d at 1080; *Gilbert*, 920 F.2d at 882. A mere "scintilla" of evidence supporting the opposing party's position, however, will not suffice. *E.g., Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990). "Where the record, taken as a whole could not lead a rational trier of fact to find for the nonmoving party, then there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356; *see Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *Johns*, 927 F.2d at 556.

## II.  *D'Oench Duhme Doctrine*

■ RTC contends that the *D'Oench, Duhme* doctrine presents an insurmountable hurdle to the Milligans' claims. The *D'Oench, Duhme* doctrine is a "common law rule of estoppel precluding a borrower from asserting against the FDIC defenses based upon secret or unrecorded 'side agreements' that alter[ ] the terms of [a] facially unqualified obligation." *Campbell Leasing, Inc. v. Fed. Deposit Ins. Corp.*

*["FDIC"]*, 901 F.2d 1244, 1248 (5th Cir. 1990) (citation omitted). Although initially limited to the Federal Deposit Insurance Corporation ("FDIC"), it is now settled that Federal Savings and Loan Insurance Corporation ("FSLIC"), in its capacity as receiver for failed savings and loans, may raise federal common law defenses premised upon the doctrine. *FSLIC v. Two Rivers Assocs.*, 880 F.2d 1267, 1274–77 (11th Cir.1989). Because RTC is FSLIC's corporate successor, thus standing in FSLIC's shoes, *In re Resolution Trust Corp.*, 888 F.2d 57, 59 (8th Cir.1989), it may assert the doctrine also. *Castleglen, Inc. v. Commonwealth Sav. Ass'n*, 728 F.Supp. 656, 662 (D.Utah 1989); *see Vernon v. Resolution Trust Corp.*, 907 F.2d 1101, 1107 (11th Cir.1990).

The *D'Oench, Duhme* doctrine is named after the case from which it sprang. *See D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). A recent Eleventh Circuit opinion describes what happened in *D'Oench:*

> [A] bank obtained a promissory note to prevent the bank's books from reflecting a loss from another debtor which had defaulted; however, an understanding existed between the bank and the notemaker that the bank would not enforce the note and that the interest paid would be remitted to the notemaker. The bank later failed. The [FDIC], as the bank's insurer, attempted to collect on the note. The notemaker contended that he owed nothing to the bank. The Supreme Court concluded, however, that there exists "a federal policy to protect [the FDIC], and the public funds which it administers, against misrepresentations as to the securities or other assets in the portfolios in the banks which [the FDIC] insures or to which it makes loans." *D'Oench*, 315 U.S. at 457 [62 S.Ct. at 679]. Even though the notemaker had no intention of deceiving any authorities and no harm was actually done, the Court refused to allow the notemaker to escape his liability on the basis of a secret arrangement between himself and the bank, because that arrangement violated public policy.

*Vernon*, 907 F.2d at 1104. The federal policy articulated in *D'Oench* reflects the reality that "the FSLIC and the FDIC [and RTC] must be able to rely upon financial institutions records in order to best protect the public funds they administer." *FDIC v. McCullough*, 911 F.2d 593, 600 (11th Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991) (citation omitted); *see Langley v. FDIC*, 484 U.S. 86, 91–92, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987).

Initially the doctrine applied only to cases factually similar to *D'Oench* itself, that is, to cases in which a debtor attempted to avoid liability to the FDIC on a debt instrument from an insolvent bank by claiming an unrecorded side agreement that discharged any obligation to pay the debt. Today, however, the doctrine has expanded in the federal common law well beyond that narrow factual setting. *McCullough*, 911 F.2d at 599–600; *Vernon*, 907 F.2d at 1105–06. The paradigm Eleventh Circuit *D'Oench* case arises when an insolvent lending institution has defrauded a borrower, participated in unrecorded promises or arrangements, or made oral inducements. *D'Oench* applies in other factual situations as well: "[T]he rationale behind D'Oench has been extended far beyond the factual setting in D'Oench itself, and now applies to virtually all cases where a federal depository institution is confronted with an agreement not documented in the institution's records." *Baumann v. Savers Fed. Sav. & Loan Ass'n*, 934 F.2d 1506, 1510 (11th Cir.1991).

Indeed, the federal courts have uniformly protected federal insurers by according a federal common law "holder in due course" status to FDIC, FSLIC, and RTC. *See Vernon*, 907 F.2d at 1106. Although RTC may not qualify technically as a holder in due course under state law, this fact is "inconsequential to the determination that [RTC] should be treated as a holder in due course under *federal common law*." *McCullough*, 911 F.2d at 603 n. 10. As the Eleventh Circuit explained:

> [U]nder *D'Oench*, courts have protected [the federal banking agencies] not only from secret or misleading schemes or

agreements, but have created for them a *quasi-holder-in-due-course status,* whereby if the insurer purchases a note in a good faith transaction without any knowledge of any wrongdoing involving the note, the insurer and its successors have a complete defense against, inter alia, state and common law fraud, violation of state or federal securities laws, and the affirmative defenses of waiver, estoppel, unjust enrichment, failure of consideration and usury.

*Vernon v. RTC,* 907 F.2d at 1106 (emphasis added). The federal common law defenses available to the RTC are analogous to the defenses that could be raised by a holder in due course under state law. *McCullough,* 911 F.2d at 603; *FDIC v. Gulf Life Ins. Co.,* 737 F.2d 1513, 1517–18 (11th Cir.1984). "Holders in due course take instruments free of competing claims and personal defenses, but subject to real defenses that render the instrument void rather than merely voidable." *Olney Sav. & Loan Ass'n v. Trinity Bank Sav. Ass'n,* 885 F.2d 266, 275 (5th Cir.1989) (citing U.C.C. § 3–305; White & Summers, *Uniform Commercial Code* § 14–9 (1980)). In this way, *D'Oench* doctrine protects against the "evil" that occurs when "the private party seeks to rely upon unrecorded promises or schemes that purport to impose obligations other than those appearing in the bank's records upon the financial institution." *McCullough,* 911 F.2d at 600.

▇ The *D'Oench* doctrine has been partially codified at what is now 12 U.S.C. § 1823(e) (1988). Section 1823(e) provides:

No agreement which tends to diminish or defeat the interest of the Corporation [FDIC] in any asset acquired by it ... either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

(1) shall be in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, and official record of the depository institution.

Since the passage of FIRREA, this provision also applies to RTC. *Baumann,* 934 F.2d at 1515. Although most cases interpreting *D'Oench* or section 1823(e) concern either the FDIC or FSLIC, the Eleventh Circuit considers all of these cases as precedent. *Id.* In short, to determine whether a defense is barred by section 1823(e) and *D'Oench, Duhme* doctrine, a court must ask "whether the purported [scheme or] agreement relied upon by the private party was ever memorialized in writing or otherwise made explicit such that the FSLIC or the FDIC would have knowledge of the bank's obligations during an evaluation of the bank's records." *McCullough,* 911 F.2d at 600 (citation and footnote omitted).

### III. *Do D'Oench, Duhme and Section 1823(e) Doom the Milligan's Claims Against RTC?*

#### A. *The Milligans' Legal Theories*

To defeat RTC's interest in this action, the Milligans assert a "perfect equity" conferring legal title to them in the Waubun Woods property by virtue of the sales contract with GMI. They argue that NCF Mortgage had notice of this prior interest through the involvement of William J. Shearhouse, Jr. and his law firm in the closings of the Stephenson Avenue sale and the construction loan. Therefore, conclude the Milligans, NCF Mortgage was not a bona fide purchaser for value, the deed acquired by NCSLA is void, and RTC, first as conservator and later as receiver, never acquired any right, title or interest in an asset as required by section 1823(e). To reach the conclusion that the security agreement is void, the Milligans make several long and farfetched arguments under Georgia law to support their contentions. In response, RTC twists Georgia law to its own purposes.

This determination is simpler than the parties think. Both RTC and the Milligans spend a great deal of time arguing over the concepts of "perfect equity" and "estoppel by deed," and disputing whether PGCCI and GMI are the same entity, whether Shearhouse acted as the NCSLA's closing agent, and whether Shearhouse's knowledge of the sales contract can be imputed to NCSLA via agency principles. None of these questions need to be answered to decide RTC's motion. Construing all reasonable inferences in favor of the Milligans, the nonmovant, and even assuming that the legal conclusions are correct, the Milligans claims against RTC are doomed as a matter of federal common law.

**B. *Federal Common Law and Holder In Due Course Status***

As discussed above, under federal common law, holders in due course are subject only to those real defenses that render an instrument void. *D'Oench* vests the RTC with holder in due course status unless the RTC participates in creating the "irregularity" or "flaw" in the instrument. *See McCullough*, 911 F.2d at 604 n. 10. Because the federal common law defenses available to the RTC are analogous to the defenses that could be raised by a holder in due course under state law, the question for this Court is whether Georgia state law, with a federal common law gloss, affords a holder in due course protection from the Milligans' claims.

Under Georgia law, a holder in due course takes an instrument free from:

(1) All claims to it on the part of any person; and

(2) All defenses of any party to the instrument with whom the holder has not dealt except:

(a) Infancy ...,

(b) Such other incapacity, or duress, or illegality of the transaction as renders the obligation of the party a nullity; and

(c) Such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or essential terms; and

(d) Discharge in insolvency proceedings; and

(e) Any other discharge of which the holder has notice when he takes the instrument.

O.C.G.A. § 11–3–305 (1982). Obviously, many of these defenses, such as infancy or discharge in insolvency, do not apply to this action. The Milligans' claims, therefore, may fall only within the defenses described in subsection 2(b) or subsection 2(c). The defense listed in subsection 2(b) " 'referring to such ... illegality of the transaction as renders the obligation of the party a nullity' refers to those defects which render the instrument void, not merely voidable." *Citizens Nat. Bank of Quitman v. Brazil*, 141 Ga.App. 388, 388, 233 S.E.2d 482 (1977). The only type of fraud assertable against a holder in due course under subsection 2(c) of the Georgia statute is fraud in factum. *See, e.g., Massey–Ferguson Credit Corp. v. Wiley*, 655 F.Supp. 655, 658 (M.D.Ga.1987) (fraud in factum is the only type of fraud available as a defense against a holder in due course). Fraud in the inducement, "which does not go to the essence of the agreement but merely induces the party to enter the agreement, would not have the same effect because in would render the instrument merely voidable and capable of transfer." *FSLIC v. Gordy*, 928 F.2d 1558, 1563 (11th Cir.1991) (citing *Langley*, 484 U.S. at 93–94, 108 S.Ct. at 402). Thus, analyzed within the framework of holder in due course doctrine, the only conceivable argument the Milligans can advance is that the security agreement is void because of fraud in factum or that it is void because it is a nullity.

**1. Fraud in Factum**

The Milligans cite *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987) to support their contention that the deed to secure debt was void. In *Langley*, the Supreme Court noted in dictum that while a bank's misrepresentations did not defeat enforcement by the FDIC, fraud in the factum might do so. *Langley*, 484 U.S. at 93, 108 S.Ct. at 402. Although the Elev-

enth Circuit has yet to find the dicta in *Langley* controlling, *see FDIC v. McCullough*, 911 F.2d at 602 n. 7, other courts have recognized that fraud in factum may negate the federal depository institution's interest. *See, e.g., FDIC v. Turner*, 869 F.2d 270, 276 (6th Cir.1989) (allowing guarantor to assert fraud in factum as defense against FDIC where debtor's name and name of bank was whited out and name of another bank and another debtor was inserted in agreement). This Court need not decide whether *D'Oench* and section 1823(e) protect the RTC from such fraud claims because there are no allegations in this case that indicate fraud in factum. Recently, the Eleventh Circuit described fraud in factum as " 'the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents,' as fraud which occurs 'within the instrument itself,' and as fraud arising 'when a party signs a document without full knowledge of the character or essential terms of the instrument.' " *Gordy*, 928 F.2d at 1565 (citations omitted). On the record before this Court, there is no basis for a determination that the PGCCI security deed was a void instrument due to fraud in factum. The Milligans do not allege that PGCCI signed the promissory note and conveyed the security deed without knowledge of its contents or reasonable opportunity to discover its essential character. Any fraud alleged in connection with the real estate contract between GMI and the Milligans is irrelevant to the holder in due course analysis because NCF Mortgage, NCSLA, and RTC never acquired that contract.

### 2. Void or Voidable Deeds

The Milligans main argument is that the deed to secure debt from PGCCI to NCSLA is a nullity, and therefore RTC could not acquire any right, title, or interest in the security deed. Through this argument, the Milligans attempt to wedge this case within the narrow exception to *D'Oench* for situations in which no asset was ever acquired. This attempt fails, as explained below.

A typical example of this narrow exception to *D'Oench* is found in *Olney Sav. &* *Loan Ass'n v. Trinity Bank Sav. Ass'n*, 885 F.2d 266, 274–75 (5th Cir.1989). In *Olney*, the court found that the FSLIC acquired no asset when it stepped in as conservator for Trinity Bank. Trinity Bank had financed a package of twenty loans for development of a townhouse complex, and Olney had agreed to purchase a 90% participation interest in most of the loans through a loan participation agreement and a letter of commitment. After default, Olney sued Trinity for rescission of the loan contracts and damages. Olney alleged that Trinity Bank and the loan servicer made misrepresentations to Olney during negotiations over Olney's participation in the loans. The jury found in Olney's favor and Olney elected rescission as its remedy. After final judgment, the FSLIC stepped in as conservator for the insolvent Trinity Bank and asserted *D'Oench* as a complete defense to Olney's claims regarding the participation agreement. Although the Court found that the participation agreement qualified as a secret agreement under *D'Oench*, the court held that *D'Oench* did not apply: "Because the Participation Agreement had been voided by the entry of judgment for rescission, FSLIC acquired no right, title, or interest that could be diminished or defeated by the representations." *Accord Grubb v. FDIC*, 868 F.2d 1151, 1158 (10th Cir.1989) (instrument voided by entry of a judgment does not constitute a "right, title, or interest" if acquired later by receiver). *Cf. FSLIC v. Gordy*, 928 F.2d at 1565 (addressing plaintiff's argument that bank's misrepresentations of its financial condition rendered loan guaranties void *ab initio* and therefore FSLIC could not maintain lawsuit because it acquired no asset).

Although these cases provide support for the proposition that *D'Oench* and section 1823(e) do not apply where the RTC has not acquired any "right, title, or interest," this is not the case here. In contrast to the *Olney* and *Grubb* cases, there has been no judgment voiding or rescinding the PGCCI security deed and note. Nevertheless, the Milligans assert that the RTC acquired no right, title, or interest because the deed to

secure debt is void (or a nullity) under Georgia law.

To understand the concept of holder in due course status as it applies to mortgage deeds, it is helpful to explore the common law's distinctions between void and voidable deeds. *Black's Law Dictionary* defines "void" as "Null; ineffectual; nugatory; having no legal force or binding effect; unable to support the purpose for which it was intended." *Black's Law Dictionary* 1411 (5th ed. 1979). The term "voidable" is defined as "That which may be avoided, or declared void; not absolutely void, or void in itself. That which operates to accomplish the thing sought to be accomplished, until the fatal vice in the transaction has been judicially ascertained and declared." *Id.* Although the distinction between a void and voidable deed is tenuous, the distinction is important because "nothing can be founded on a deed which is absolutely void, whereas from those which are only voidable fair titles may flow." 2 George Pindar, *Georgia Real Estate Law*, § 19–14.1, at 102 (1986) (quoting *Somes v. Brewer*, 19 Mass. (2 Pick.) 184, 191, 13 Am.Dec. 406). Thus, if the security deed was void under Georgia law, then NCSLA (and therefore, RTC) never acquired any right, title, or interest in the Waubun Woods property. If the security deed was voidable, however, then RTC acquired an interest, right, or title within the meaning of *D'Oench* and section 1823.

■ The PGCCI security deed was merely voidable, and not void. Georgia's statutory and common law provide support for the proposition that the deed to secure debt is merely voidable, even if all of the Milligans' factual and legal assertions are true. In *Elrod v. Bagley*, 154 Ga. 670, 115 S.E. 3 (1922), for example, the Georgia Supreme Court explained the concept of "perfect equity." The plaintiff in *Elrod* purchased land from the vendor through a real estate contract. The plaintiff paid the purchase money and took possession of the property

but never received a deed. Subsequently, the defendant purchased the property from the same vendor with notice of the plaintiff's claim for title. The court found that, "Under such circumstances the title of the plaintiff was superior to that of this defendant. In this State a perfect equity is a good title, and is sufficient to support or defend ejectment." *Id.* at 672, 115 S.E. 3. Based on this evidence, the Georgia Supreme Court found that "the plaintiff made out a case upon which he was entitled to go to the jury." *Id.* at 673, 115 S.E. 3. *Accord Stembridge v. Smith*, 213 Ga. 227, 231, 98 S.E.2d 609 (1957) ("On proof of [plaintiff's perfect equity], a court of equity would be fully authorized to cancel [the deed of a subsequent purchaser with notice] as a cloud on the plaintiff's title").

Neither of these cases indicates that the deed to the subsequent purchaser was void. Instead, the cases merely hold that the title of a purchaser with an equitable interest is superior to the voidable title of a subsequent purchaser with notice. Because of this holding, both *Elrod* and *Stembridge* allow for cancellation of the later deed by a court of equity. By contrast, "where a deed is void, the court in actions of ejectment or similar actions may simply recognize it as invalid without any formal cancellation. 2 Pindar § 19–97.1, at 140 n. 2 (citing *Bond v. Sullivan*, 133 Ga. 160 (1909) (court properly refused to require plaintiff to file any equitable pleadings for the cancellation of the deed because transaction in which married woman conveys property for purpose of paying her husband's debts is "not merely voidable, but is absolutely void"). Thus, assuming that the Milligans have perfect equity, and assuming that NCSLA took with notice of this perfect equity, NCSLA's security interest in the property would not be void, but merely voidable.

Georgia's recording statute, O.C.G.A. § 44–2–1 (1982) [1], supports the Court's conclusion that a later deed from the same

---

**1.** O.C.G.A. § 44–2–1 provides, "Every deed conveying lands shall be recorded in the office of the clerk of the superior court of the county where the land is located. A deed may be recorded at any time; but a prior unrecorded deed loses its priority over a subsequent recorded deed from the same vendor when the purchaser takes such deed without notice of the existence of the prior deed."

vendor, even to a purchaser with notice, is merely voidable, and not void. The Milligans assert that NCF Mortgage was not a bona fide purchaser for value within the meaning of the statute because it had notice of the plaintiff's prior perfect equity through its alleged agent, William J. Shearhouse, Jr. Even if this dubious state law argument is correct, the fact that NCF Mortgage may not have qualified as a bona fide purchaser for value because it had notice of the Plaintiffs' alleged "perfect equity" does not compel the conclusion that the PGCCI deed is void. It simply means that in a private dispute over priority of title, the Milligans, who did not record their sales contract, would nevertheless prevail over NCF Mortgage who recorded its deed, because NCF Mortgage took the property with notice of the Milligans' interest.

This is not a private dispute, however. The presence of RTC alters the character of this action. The Eleventh Circuit faced a similar situation in *McCullough:* "Although the error in acknowledgement might render the mortgage voidable were this suit involving two private parties litigating under state law, we conclude that the FSLIC's federal common law defenses bar the McCullough's claim of improper notarization." *McCullough,* 911 F.2d at 602. The court then applied *D'Oench, Duhme* doctrine: "On its face, the mortgage appears valid. As such, it would have been impossible for the bank examiners to have had any suspicions concerning the legal sufficiency of the mortgage during an examination of Old Twin City's records." *Id.*

The same is true in the case at bar. On its face, the deed to secure debt given in connection with the construction loan is valid. NCSLA was not a party to the earlier transaction. The Milligans did not record the sales contract allegedly giving rise to their "perfect equity". *See* O.C.G.A. § 44-2-6 (1982). Thus, neither the record title to the Wauban Woods property nor the documents forwarded to or contained in the records of NCF Mortgage Company would have revealed the Plaintiffs' prior interest to the RTC. It would have been impossible for RTC to have had suspicions concerning the legal sufficiency of the deed during an examination of NCF's records. The RTC therefore, acquired a "right, title, or interest" consistent with the purposes of *D'Oench, Duhme.* Therefore, the RTC is entitled to summary judgment.

The Court must address two final issues. The Milligans' complaint hints that both the sales contract between GMI and the Milligans and the construction loan transaction were part of an overall fraudulent scheme. *D'Oench* would bar that defense even if RTC knew that the scheme existed at the time it acquired the note, *see, e.g., McCullough,* 911 F.2d at 600 n. 5, so long as the scheme would not have been apparent to RTC during a typical evaluation of the bank's records. *Id.* at 600; *see Twin Construction, Inc. v. Boca Raton, Inc.,* 925 F.2d 378, 383 (11th Cir.1991); *FSLIC v. Two Rivers Assocs.,* 880 F.2d 1267, 1275 n. 12 (11th Cir.1989); *see also FDIC v. Merchants Nat. Bank of Mobile,* 725 F.2d 634, 640 (11th Cir.1984), *cert. denied,* 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984) ("If a side agreement does not meet the requirements of Sec. 1823(e), FDIC's knowledge of the terms of that side agreement does not render it valid against FDIC or estop FDIC from enforcing the agreement as contained in the failed bank's records"). The Milligans do not contend that RTC could have learned of the alleged fraudulent scheme during a typical bank examination.

■ Finally, the Milligans, apparently relying on earlier cases, assert that *D'Oench* should not bar their defense because they were completely innocent of any wrongdoing and did not purposefully "lend [themselves] to a scheme or arrangement whereby the banking authority ... was or was likely to be misled." *D'Oench,* 315 U.S. at 461, 62 S.Ct. at 681. The Milligans' innocence of any wrongdoing will not save them from the broad reach of the *D'Oench, Duhme* doctrine. The Eleventh Circuit has stated recently: "In light of our recent decisions on this issue ... it is clear that this exception is no longer tenable because lack of bad faith, recklessness, or even

negligence is not a defense in *D'Oench* cases." *Baumann v. Savers Federal Sav. & Loan Assoc.*, 934 F.2d at 1516; *see Gordy*, 928 F.2d at 1566.

### Conclusion

After a thorough review of the Milligan's defenses to RTC's motion for summary judgment, the Court concludes that *D'Oench, Duhme* doctrine and 12 U.S.C. § 1823(e) (1988) bar the Milligans' claims against RTC. Therefore, the Court GRANTS RTC summary judgment.

This result is harsh. Nevertheless, "[a]s pitiful as the Plaintiff's situation may be, a more compelling consideration, in view of the monstrous national debt burden imposed by the spate of recent bank failures, is the sanctity and uniform application of the *D'Oench* doctrine and [12 U.S.C. § 1823(e)]." (Reply Of RTC To Plaintiff's Opposition To RTC's Motion For Summary Judgment, at 7). Although there may be an understandable reason for the Milligans' failure to obtain an attorney and to record their sales contract, "As between private parties and federal deposit insurance agencies, both Congress and the Supreme Court have placed the burden on private parties to document fully the contours of their obligations from the inception of the transaction." *Baumann*, 934 F.2d at 1517.

Because the RTC is no longer a party to this case, the Court lacks jurisdiction over the Plaintiffs' claims against the remaining Defendants. Accordingly, the Court REMANDS this action to the Chatham County Superior Court.

SO ORDERED.