IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-2506
_____

IN THE MATTER OF:  5300 MEMORIAL INVESTORS, LTD.,
                                    Debtors.

5300 MEMORIAL INVESTORS, LTD.,

                                    Appellant,
                                    Cross-Appellee,

VERSUS

RESOLUTION TRUST CORPORATION,
As Receiver of
SAN JACINTO SAVINGS ASSOCIATION
and
SAN JAC FINANCIAL SERVICES, INC.,

                                    Appellees,
                                    Cross-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____
(September 16, 1992)

Before KING, WILLIAMS, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

I.

The facts and underlying transactions in this complex commercial case are set forth in the substitute opinion of the Texas Court of Appeals, which we attach as an appendix to this opinion. See San Jac Fin. Servs. v. 5300 Memorial Investors, No. 01-88-00579-CV, 1990 Tex. App. LEXIS 1857 (Tex. App. )) Houston [1st Dist.] July 26, 1990, writ mooted by removal to federal district

court) (unpublished) (on motion for rehearing).  After the issuance of the state court of appeals's opinion, and while a writ of error to the Texas Supreme Court was pending, San Jacinto Savings Association failed, and the Resolution Trust Corporation (RTC) was appointed as its receiver.  Pursuant to 12 U.S.C. § 1441a(l)(3), the RTC removed the action to the United States District Court for the Southern District of Texas, which adopted the judgment of the Texas Court of Appeals as its own.  The plaintiff, 5300 Memorial Investors, Ltd. ("5300 Memorial"), appeals that judgment, and the RTC cross-appeals.

## II.

### A.

We must examine the basis of our jurisdiction, on our own motion if necessary.  United States v. Cronan, 937 F.2d 163, 164 (5th Cir. 1991).  Although neither party raised, in its brief, the question of federal jurisdiction, we sua sponte requested the parties to file supplemental briefs addressing whether removal jurisdiction exists here.  On the basis of a recent en banc opinion of this court, we conclude that we have jurisdiction.

At the time of the instant removal, section 1441a(l)(3) provided that the RTC

> may remove any action, suit, or proceeding from a State court to the United States district court with jurisdiction over the place where the action, suit, or proceeding is pending, to the United States district court for the District of Columbia, or to the United States district court with jurisdiction over the principal place of business of any institution for which the Corporation has been appointed conservator or receiver if

2

the action, suit, or proceeding is brought against the institution or the corporation as conservator or receiver of such institution . . . .

In Federal Deposit Insurance Corp. v. Meyerland Co. (In re Meyerland Co.), 960 F.2d 512 (5th Cir. 1992) (en banc), we construed a similarly-worded statute conferring extraordinary powers of removal upon the Federal Deposit Insurance Corporation (FDIC).  That provision, 12 U.S.C. § 1819(b)(2)(B), states that the FDIC "may . . . remove any [action to which it is a party] from a state court to the appropriate United States district court."  Removal also was based upon 12 U.S.C. § 1819(b)(2)(A), stating that "all suits of a civil nature at common law or in equity to which the [FDIC], in any capacity, is a party shall be deemed to arise under the laws of the United States."  Similarly, in the instant case, 12 U.S.C. § 1441a(l)(1) grants federal-question status to actions to which the RTC is a party:

> Notwithstanding any other provision of law, any civil action, suit, or proceeding to which the [RTC] is a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction over such action, suit, or proceeding.

In Meyerland, the action was removed after oral argument in the Texas Court of Appeals but before a decision was rendered. Here, the state court of appeals has issued an opinion, and a writ of error to the state supreme court was pending when the removal petition was filed. In Meyerland, we concluded the following:

> Any action in a state court may be removed.  This language does not limit removable actions to those that have not yet reached a state trial court judgment, nor

3

> does it limit removable actions to those that come to the federal courts from a specific state court (i.e., from state trial, as opposed to appellate, court).

960 F.2d at 516 (emphasis added).

This unequivocal statement plainly encompasses the circumstance in the case sub judice: A case to which the RTC becomes a party is removable from any state court. Certainly, since the Texas Supreme Court qualifies as a "state court," we need not query whether a matter pending on writ of error is in the state court of appeals or the state supreme court. Either way, it is in state court and subject to removal under section 1441(l)(1).

We see no principled basis upon which to distinguish this case from Meyerland. There, we reasoned that "[t]he significant factor . . . is that state appellate proceedings had not yet been exhausted when removal was effected." 960 F.2d at 517 (citing Murray v. Ford Motor Co., 770 F.2d 461, 463 (5th Cir. 1985) (per curiam)); Butner v. Neustadter, 324 F.2d 783 (9th Cir. 1963); Munsey v. Testworth Labs., 227 F.2d 902, 903 (6th Cir. 1955) (per curiam). See FDIC v. Yancey Camp Dev., 889 F.2d 647, 648 (5th Cir. 1989).

Here, plainly, the state appellate process was moving forward when the RTC removed. The fact that the state court of appeals had rendered its decision is of no moment, given our reasoning in Meyerland. Although we recognize the federalism concerns expressed in the dissent in Meyerland, see 960 F.2d at 522-26 (Politz, C.J., dissenting), we note that, as in Meyerland,

4

we merely are playing the hand that Congress has dealt us.  <u>See</u> <u>id.</u> 960 F.2d at 519-20.

B.

Having concluded that removal was jurisdictionally proper, we must consider the appropriate procedural disposition of the case once removal was effected.  In <u>Meyerland</u>, citing <u>Granny Goose Foods v. Brotherhood of Teamsters, Local No. 70</u>, 415 U.S. 423, 435-36 (1974), we noted that "[a] case removed from state court simply comes into the federal system in the same condition in which it left the state system."  960 F.2d at 520. Accordingly, we held that upon receipt of the removed proceeding, "the district court [should] take the state judgment as it finds it, prepare the record as required for appeal, and forward the case to a federal appellate court for review."  <u>Id.</u>

That is precisely what the federal district court did in the instant matter.  Citing <u>Granny Goose Foods</u>, on April 16, 1991, it issued a one-page opinion stating that "[t]he July 26, 1990, order of the Court of Appeals will be adopted as an order of this court so that the parties may have the opportunity to pursue their appeals in the federal courts."  The opinion was accompanied by a contemporaneous judgment stating that "[t]he judgment signed on July 26, 1990, by the Texas Court of Appeals for the First District in Cause No. 01-88-00579-CV is ordered entered as the judgment of this court."

Thus, the district court anticipated our directive in <u>Meyerland</u> by more than a year.  It correctly entered the state

5

court's judgment as its own, complying with the requirement set forth in Granny Goose Foods. Accord Walker v. FDIC, Nos. 89-2866, 89-2983, 1992 U.S. App. LEXIS 20537, at *19 & n.12 (5th Cir. Sept. 2, 1992). We note, as well, that it makes no difference that the adopted judgment here is from a state appellate court rather than, as in Meyerland, from a state trial court: It is a state judgment, nonetheless.

III.

We also have raised, sua sponte, the question of whether, under section 1441a(l)(3), this matter should have been removed to the United States District Court for the District of Columbia instead of to the United States District Court for the Southern District of Texas. The obvious reading of this plain language is that unless the RTC was involved in the original dispute that spawned the state court litigation, the only federal court to which the case may be removed is in the District of Columbia. At least one other circuit court of appeals has so held, see RTC v. Westgate Partners, 937 F.2d 526, 531 (10th Cir. 1991), and none to our knowledge has disagreed; accord RTC v. Sloan, 775 F. Supp. 326, 332 (E.D. Ark. 1991); Piekarski v. Home Owners Sav. Bank, 743 F. Supp. 38, 41 (D.D.C. 1990).

On the other hand, Congress has amended section 1441a(l)(3), effective February 1, 1992 (subsequent to the instant removal), to allow removal, in cases such as this, to the District of Columbia, "or if the action, suit, or proceeding arises out of

6

the actions of the [RTC] with respect to an institution for which a conservator or a receiver has been appointed, the United States district court for the district where the institution's principal business is located." <u>See</u> Resolution Trust Corporation Refinancing, Restructuring and Improvement Act of 1991, P.L. 102-233, 105 Stat. 1772, 12 U.S.C. § 1441a(<u>l</u>)(3)(A). If that amendment is to be applied retroactively, removal here to the Southern District of Texas undeniably was appropriate.

We need not decide the question of retroactivity, however. Provisions permitting suit to be brought only in certain district courts, including those conferring special venue in the District of Columbia, are treated as venue, rather than jurisdictional, requirements. <u>See generally</u> 1A JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 0.344[17] (2d ed. 1991). This court and others consistently have construed the former provision in section 1441a(<u>l</u>)(3), allowing removal only to the District of Columbia, as concerning solely venue and not jurisdiction. In <u>RTC v. Sonny's Old Land Corp.</u>, 937 F.2d 128, 130-31 (5th Cir. 1991), for example, we held that the provision is procedural, not jurisdictional, and that a party that had not asserted a seasonable objection to improper venue had waived the defect. <u>See also</u> <u>RTC v. Lightfoot</u>, 938 F.2d 65, 66 (7th Cir. 1991).

Here, the parties never raised the potential defect of removal to a district other than the District of Columbia. Consequently, we consider the matter waived.

V.

A.

In its comprehensive substitute opinion, the Texas Court of Appeals reversed the judgment of the state trial court and remanded for a new trial. We agree that that is the proper resolution of the merits of this case. For the reasons set forth in the state court of appeals's opinion, we vacate the judgment of the federal district court and remand to it for a new trial.

B.

The RTC contends that it is entitled to assert its rights under D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 (1942), and its codification in 12 U.S.C. § 1823(e). 5300 Memorial argues that the RTC cannot raise such matters for the first time on appeal.

Obviously, the reason these matters were not raised previously is that the RTC was not a party until it was appointed receiver, which was after trial and after the Texas Court of Appeals had issued its opinion. Importantly, the RTC urges D'Oench, Duhme and section 1823(e) in support of the judgment of the state court of appeals, which was in existence at the time the RTC became receiver.

We have stated that under such circumstances, these defenses may be asserted for the first time on appeal. See Meyerland, 960 F.2d at 519 (dictum); RTC v. McCrory, 951 F.2d 68, 71-72 (5th Cir. 1992), petition for cert. filed, 60 U.S.L.W. 3816 (U.S. May 11, 1992) (No. 91-1842); Union Bank v. Minyard, 919 F.2d 335, 336

8

(5th Cir. 1990).[1]  Accordingly, on remand the RTC may urge the defenses afforded by D'Oench, Duhme and section 1823(e).

VACATED and REMANDED.

---

[1] See also FDIC v. Castle, 781 F.2d 1101, 1105 (5th Cir. 1986); Ward v. RTC, No. 91-3015, 1992 U.S. App. LEXIS 17424, at *6-*7 (8th Cir. July 30, 1992) (citing Meyerland); Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust), Nos. 91-1976, 91-1977, 1992 U.S. App. LEXIS 14258, at *29 (1st Cir. June 19, 1992).  But cf. Thurman v. FDIC, 889 F.2d 1441, 1447 (5th Cir. 1989); Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n, 885 F.2d 266, 275 (5th Cir. 1989).

APPENDIX

Opinion

In The

Court of Appeals

For The

First District of Texas

_____

NO. 01-88-00579-CV
_____

SAN JAC FINANCIAL SERVICES and SAN JACINTO SAVINGS ASSOCIATION,
Appellants

V.

5300 MEMORIAL INVESTORS, LTD., JOHN M. MC GINTY, MILTON B. MC GINTY,
B. BURKE MC GINTY, and J. L. PARISH, Appellees

On Appeal from the 189th District Court
Harris County, Texas
Trial Court Cause No. 87-09314

ON MOTION FOR REHEARING

Appellants and appellees filed motions for rehearing. We overrule the motions for rehearing, withdraw our earlier opinion dated February 15, 1990, and in its place substitute the following.

This is an appeal from a judgment based on a jury's answers to 43 jury questions in a contract lawsuit. We reverse and remand.

In eleven points of error, appellants San Jacinto Financial Services, Inc. ("the Purchaser") and San Jacinto Savings Association ("the Escrow Holder") assert that: the evidence was legally and factually insufficient to

support certain of the jury's answers to jury questions; the trial court should have reformed the contract to reflect the true agreement of the parties; the trial court erred in failing to enter judgment in favor of Purchaser on its usury claim; the trial court erred in awarding attorneys' fees to appellee, 5300 Memorial Investors, Ltd., and in not awarding attorneys' fees to appellants; and certain of the jury's answers to jury questions fatally conflict and are irreconcilable.

In three cross points, appellees assert that: the trial court erred in submitting jury question No. 33 to the jury; the trial court erred in overruling appellees' motion for leave to file a sixth amended original petition; and the trial court erred in failing to award prejudgment interest at the rate of 12% per annum.

The following facts are uncontested:

5300 Memorial Investors, Ltd., a limited partnership ("Seller"), built an office building at 5300 Memorial Drive in Houston, Texas, in 1982, and by 1984 it was almost 70% leased. The general partner, John "Jack" McGinty, was approached in 1984 by a real estate broker who said that Southmark Corporation was interested in purchasing the building. On January 17, 1985, Southmark signed a letter of intent to buy the building, and Jack McGinty began discussions with representatives of Southmark. The agreed price for the building was $17,900,000. The parties, in addition to signing a purchase and sale agreement, were to sign a finishout, lease-up and rental guarantee agreement, guaranteeing a minimum rental income to Purchaser for a term of 3 years. The parties also agreed that an escrow fund would be set up, with $1,156,900 to be deposited by Seller, to secure the guaranteed yield to be paid to Southmark.

Seller provided copies of all the leases to Southmark. In April and May of 1985, the various general and limited partners of Seller began signing the purchase and sale agreement. On May 23, 1985, the chairman of Southmark, Gene Phillips, during a 10-day period of inspection of the building, threatened to cancel the purchase of the building if there were no additional monies set

11

aside in the escrow fund.  The parties signed a letter agreement modifying the terms of the purchase and sale contract by having Seller put an additional $400,000 into the escrow account, in exchange for an increase in the sale price represented by a $150,000 promissory note benefitting Seller, which was also added to the escrow account.  The escrow fund therefore contained $1,556,900, plus the value of the $150,000 note.

The closing of the sale was on June 19, 1985; the effective date of the sale was July 2, 1985.  The purchaser of the building was San Jac Financial Services.  San Jacinto Savings, a Southmark subsidiary, was the escrow holder.

The preamble to the Finishout, Lease-up and Rental Guarantee Agreement, reads as follows:

> WHEREAS, simultaneously herewith, pursuant to that certain Agreement of Purchase and Sale dated April, 1985, Seller has conveyed to Purchaser that certain property known as 5300 Memorial Office Building (the "Project") and,
>
> WHEREAS, Purchaser and Seller Acknowledge that a portion of the space at the Project is unfinished and/or unleased; and,
>
> WHEREAS, the parties hereto have reached an understanding with respect to the obligation of the Seller, under the circumstances as provided herein, to complete the work necessary to finish the unfinished space at the Project, at Seller's cost and expense, and to pay certain amounts in regard to the leasing of the unleased space; and,
>
> WHEREAS, the parties hereto have reached an understanding that, under the circumstances as provided herein, Seller shall guarantee to Purchaser, for a specified time, a minimum rental income in connection with the Project.
>
> NOW THEREFORE, . . . the parties hereto, intending to be bound, hereby agree as follows:

The main dispute in this case involves the calculation of the "minimum rental income" guaranteed to Purchaser by Seller, and the parties' respective rights to the sums placed in escrow pursuant to the guaranty.

The first critical element of the Rental Guarantee Agreement was the "Monthly Guarantee Amount": $149,167.  On a monthly basis, that amount was to be compared with the Purchaser's Accrual Net Rental Income.  If the Monthly Guarantee Amount was larger, the difference constituted the "Monthly Payment" owed to the Purchaser, for which Purchaser was required to submit an invoice

12

to Seller and the Escrow Holder within 45 days after the end of that particular month.

That calculation and procedure controlled throughout the three years of the Agreement's term, except that the Monthly Payment was adjusted on a quarterly basis to credit Purchaser for accrued income which was never actually collected.  The Monthly Guarantee Amount was multiplied by three to reach the Quarterly Guarantee amount of $447,501, which was then compared against the sum of the Cash Net Rental Income for Existing Tenants and the Accrual Net Rental Income for New Tenants.  If the Quarterly Guarantee Amount was greater, the difference would constitute the Quarterly Obligation Amount, which was compared against the sum of the quarter's Monthly Payments.  If the Quarterly Obligation Amount was greater, then the difference constituted the Quarterly Payment owed to Purchaser, for which Purchaser was required to submit an invoice to Seller and the Escrow Holder within 45 days after the end of that particular quarter.

The critical definitions for these calculations were "Cash Net Rental Income" and "Accrual Net Rental Income":

Cash Net Rental Income:  All rental income and reimbursements . . . actually collected by Purchaser pursuant to the Project's tenant leases . . ., less the aggregate amount of the Expense Stop for all such leases.

Accrual Net Rental Income:  All rental income and reimbursements . . . accruing pursuant to the Project's tenant leases, less the aggregate amount of the Expense Stop for all such leases . . . .

The definition of Expense Stop was as follows:

Expense Stop:  The sum specified in each Project tenant lease per square foot of net rentable space per year for full common area maintenance and operating expenses (including all ad valorem tax and other assessments) which does not pass through to the tenant but is an obligation of the landlord.

Every lease in 5300 Memorial contained an "additional rent" provision, stating a dollar amount per square foot which defined the landlord's and tenant's responsibilities for the maintenance and operating expenses.  That dollar amount was commonly known as the "expense stop."[2]

---

[2] For example, the Hill and Parker lease stated that the tenant shall

13

Purchaser was authorized to invoice for payment from the Escrow Fund only if Purchaser's previous income from rentals was less than the Monthly and Quarterly Guarantee Amounts. Conversely, Seller was allowed to apply for a refund from the Escrow Fund when the money in the Escrow Fund exceeded the level necessary to guarantee the Purchaser's income for the remainder of the Agreement's term. The Rental Guarantee Agreement provided the procedure by which Seller could apply for a refund of the excess escrow amount:

> From time to time during the Term, but no more often than quarterly, Seller may submit to Purchaser a detailed accounting demonstrating the amount by which the current balance of the Escrow Fund exceeds the Required Escrow Fund.

Purchaser was then required to respond within 30 days in one of three ways:

> Purchaser shall have thirty days to review such accounting. On or before the end of such thirty days, Purchaser shall do one of the following: 1) submit an invoice (the "Refund Invoice") to Seller and Escrow Holder, directing the Escrow Holder to pay to Seller, from the Escrow Fund, the Escrow Refund Amount claimed by Seller; 2) submit an invoice (the "Adjusted Refund Invoice") to Seller and Escrow Holder directing the Escrow Holder to pay to Seller, from the Escrow Fund, the Escrow Refund Amount as calculated by Purchaser. Along with the Adjusted Refund Invoice Purchaser shall submit a detailed accounting of the Escrow Refund Amount; 3) submit to Seller a detailed accounting indicating that the Required Escrow Fund does not exceed the actual Escrow Fund.

Within 5 days after its receipt of either the Refund Invoice or Adjusted Refund Invoice, the Escrow Holder was required to ("shall") pay to Seller the indicated amount.

Despite the procedures established in the Rental Guarantee Agreement of July 2, 1985, no attempts were made by either party to withdraw any funds from the escrow account until February, 1986.

On February 28, 1986, Purchaser withdrew $297,261.09 from the escrow account without presenting an invoice, and without notifying Seller. Seller, on March 4, 1986, wrote to River Oaks Bank & Trust (where the escrow funds were held), instructing them to make no more disbursements to Purchaser. In addition, Seller's attorney wrote the bank on March 7, 1986, stating that no

---

reimburse to the landlord a pro rata share of the Basic Taxes and Basic Operating Cost which exceeded $3.50, and therefore hand an expense of $3.50 per square foot.

14

new disbursements should be made to Purchaser. On March 13, 1986, Seller wrote a letter to an analyst for Southmark, asking for more cooperation and better communication between the parties.

After additional communications between Seller and Purchaser, on April 17, 1986, Southmark supplied Seller with financial statements covering the period from July 1985 to march 1986. At the same time, Southmark said that Purchaser would withdraw another $321,132.92 from the escrow account; however, no such withdrawal has ever been made. On November 25, 1986, Purchaser sent additional financial information to Seller covering the period from July 1985 to October 1986; the controller for Southmark supplied the information. A revised version of this analysis was delivered to Seller on December 31, 1986. The revision showed that Purchaser was entitled to a total of $409,406.70 out of the escrow account through October, 1986. After deducting the $297,261.09 previously withdrawn from the escrow account by Purchaser, the analysis showed that $112,145.61 was due to Purchaser.

On December 22, 1986, Seller sent Purchaser its first application for a refund from the escrow fund, accompanied by a detailed accounting which reflected that an excess of $989,244.00 was in the escrow account. Seller made the application for refund based on the detailed accounting sent to Seller by Purchaser in November, 1986. When Seller received Purchaser's revised accounting on December 31, 1986, Seller reduced its request for refund to $962,742.00.

In a letter dated January 13, 1987, Seller wrote to Purchaser saying that Seller had decided to remove its objections to any further distributions from the escrow account to Purchaser, since Purchaser was then substantially in compliance with the requirements of the rental guarantee agreement. Seller also stated it did not waive any rights it had in the agreement. Seller acknowledged that Purchaser was entitled to withdraw $112,145.61 from the escrow account, in addition to the $297,261.09 Purchaser had already withdrawn; therefore, the total amount Seller acknowledged was due Purchaser through October 31, 1986, was $409,407.00. Seller stated that the new

15

withdrawal could be made upon proper invoice, and notice to Seller.

By letter dated March 2, 1987 (more than 30 days after Seller had submitted its application for refund), Purchaser responded to Seller's application for refund, stating that Purchaser's analysis indicated that the refund due to Seller was $99,537.00 as of October 31, 1986. However, prior to receiving Purchaser's response, Seller had already filed suit against Purchaser and the Escrow Holder on February 26, 1987, alleging breach of contract, conversion and breach of fiduciary responsibility.

On July 31, 1987, Seller wrote Purchaser requesting an additional refund of $128,777.00. Attachments to this request continued to show that the "total due Purchaser through 10/31/86" was $409,407.00, "per invoice from Purchaser delivered to Seller 12/31/86." This same document also showed monthly payments "due Purchaser" for the months of November, 1986 through June, 1987, totalling $153,075.00. Adding the two figures together, this document showed that Seller acknowledged that Purchaser was entitled to withdraw from the escrow account the sum of $562,482.00 through June, 1987.

Purchaser responded to Seller's July 31, 1987 request for refund by stating that the total refund amount due Seller was $212,564.00. Seller disagreed, stating that the total refund amount due was in excess of $1,000,000.00.

By letter dated October 15, 1987, Seller requested an additional refund of $700,048.00. In this letter, Seller no longer showed Purchaser was entitled to the $562,482.00 amount that Seller had previously acknowledged to be due to Purchaser upon proper invoice, and notice to Seller. Seller had not applied for a total of $1,818,069.00 in refunds from the escrow account. Purchaser reviewed the application and prepared an adjusted refund invoice directing the escrow holder to pay the Seller $425,114.38. It is contested whether this adjusted invoice was ever delivered to the escrow holder; however, by letter dated November 9, 1987, a check for this amount was sent to Seller's lawyers. By letter dated November 13, 1987, the check was returned on the same day it was received.

16

In the lawsuit, which had been pending since February 26, 1987, Purchaser filed a counterclaim on December 31, 1987 stating there was a material mutual mistake, or a unilateral mistake accompanied by misrepresentations of Seller, with regard to the use of the term "expense stop" in the agreement. Purchaser alleged in part that, when Seller computed "net rental income", no expenses were deducted for vacant space in the building, and "additional rents" (tenant obligations for expenses that exceed the expense stop), continued to be included as an income item, without a corresponding deduction for expenses actually incurred by the building. Purchaser sought a rescission of the contract, and alternatively prayed for a resulting trust, or a constructive trust, or a reformation of the rental guarantee agreement, or a declaratory judgment construing the rights and obligations of the parties.

River Oaks Bank & Trust filed a plea in intervention, and a petition for interpleader to deposit in the trial court the sum of $1,514,022.66 out of the escrow account. The trial court signed the order for the interpleader, and River Oaks Bank & Trust was released from liability in the suit.

Fifteen days after the trial commenced, the court submitted the case to the jury on 43 jury questions. After the return of the verdict, Purchaser filed a motion to disregard the jury's answers to jury questions 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 18(b), 19, 20, 30, 34, 35, 40, 41, and 43. The trial court denied the motion and entered its judgment awarding Seller $1,818,069.00, plus interest, exemplary damages, expert witness fees and attorneys' fees. Appellants filed a motion for new trial, which was denied on the same day. Seller also filed a motion for new trial, which was denied.

In their first point of error, appellants argue that the trial court erred in overruling their motion to disregard the jury's finding of the amount due to Seller, in response to jury question number four, because there is no evidence to support the answer and, as a matter of law, the amount is determinable by mathematical computation. Jury question number four reads as follows:

17

What sum of money, if any, do you find from a preponderance of the evidence that is due to 5300 Memorial Investors under the Rental Guarantee Agreement for the following Applications For Refund?

Answer in dollars and cents, if any.

|  |  | Answer |
|---|---|---|
| 1. | December 22, 1986 (Plaintiff's Exhibit 4) | $ 989,244 |
| 2. | July 31, 1987 (Plaintiff's Exhibit 10) | $ 128,777 |
| 3. | October 15, 1987 (Plaintiff's Exhibit 16) | $ 700,048 |

The jury was asked only to fill in the blanks in the "Answer" column. Appellants did not object to the form or substance of jury question four. The amounts listed in answers 4(1)-4(3) are identical to the amounts requested by Seller in its three applications for refund submitted on December 22, 1986, July 31, 1987 and October 15, 1987, totalling $1,818,069.[3]

In a related argument, under point of error three, appellants assert that the trial court erred in overruling their motion to disregard the jury's answers to jury questions five, six and seven (whereby the jury found purchaser waived its right to contest seller's erroneous applications for refund), because there is no evidence to support the answers and, as a matter of law, purchaser did not waive the right to contest erroneous applications for refund.

Jury question number five reads as follows:

YOU ARE INSTRUCTED THAT

It is undisputed that, within thirty (30) days of the submission of the December 22, 1986 Application for Refund (Plaintiff's Exhibit 4), San Jac Financial Services failed to perform its obligations according to Section I on Page 5 of the Rental Guarantee Agreement.

Do you find from a preponderance of the evidence that, by failing to perform its obligations as set forth above, San Jac Financial Services waived its right to contest 5300 Memorial Investors' December 22, 1986 Application for Refund?

---

[3] We note that the jury awarded Seller the amount requested in its December 22, 1986 application for refund, even though Seller later amended that application to seek a refund in the lesser amount of $962,742.00.

18

Answer "Yes" or "No."

ANSWER: Yes

> You are instructed that a waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming such right.

Jury questions six and seven address Seller's July 31, 1987 and October 15, 1987 applications for refund, and are otherwise identical to jury question number five. The jury likewise answered questions six and seven "yes".

In determining "no evidence" points, we are to consider only the evidence and inferences that tend to support the finding, and we disregard all evidence and inferences to the contrary. King v. Bauer, 688 S.W.2d 845, 846 (Tex. 1985). There is some evidence to support a finding, and more than a scintilla, if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds as to the existence of a vital fact. Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983). However, where the evidence is undisputed, so that the question is one purely of law, a jury's finding on the question is immaterial and of no force or effect. Barnes v. Archer, 77 S.W.2d 883, 885 (Tex. Civ. App. )) San Antonio 1935, no writ).

Appellants first argue that, as a matter of law, the jury award in response to question number four should be reduced by $562,482.00 ("the forfeited amount"). It is undisputed that Seller had acknowledged in writing that Purchaser was entitled to withdraw this amount from the escrow account "upon submitting a proper invoice." It is also undisputed that Purchaser had already withdrawn $297,261.09 of that sum out of the escrow account as early as February 28, 1986.[4] However, even though Seller had acknowledged that the sums totalling $562,482.00 were properly "due" Purchaser under the agreement, Seller argues that Purchaser failed to submit invoices to the Escrow Holder in such total amount, and therefore Purchaser forfeited its right to receive the sums. Thus, when Seller submitted its October 15, 1987 application for refund

---

[4] This withdrawal was made by Purchaser without presenting an invoice and without notifying Seller in advance. However, Seller later acknowledged the amount withdrawn was appropriate.

19

(October 15, 1987, being almost eight months after the present lawsuit was filed), for the first time Seller omitted any reference to the sums Seller had previously acknowledged were due to Purchaser upon proper invoice. Not only did Seller no longer acknowledge that Purchaser was due, upon invoice, any portion of the monies still in escrow, Seller also denied, in its accounting, that Purchaser was due the $297,261.09 it had withdrawn in February 1986.

Appellants correctly point out that there is no provision in the Rental Guarantee Agreement specifying that Purchaser would forfeit amounts "due" it under the Agreement if it failed to submit invoices timely, or if it failed to timely reply to seller's applications for refund. The law does not favor forfeitures, and they are to be avoided if possible. Schwarz-Jordan, Inc. v. Delisle Constr. Co., 569 S.W.2d 878, 881 (Tex. 1978); Hohenberg Bros. Co. v. George E. Gibbons & Co., 537 S.W.2d 1, 3 (Tex. 1976); Perry v. Welch, 725 S.W.2d 347, 348 (Tex. App. )) Corpus Christi 1987, no writ).

We consider it relevant that Seller does not claim it had incorrectly calculated the amounts payable to Purchaser from the escrow account (totalling $562,482.00); Seller acknowledges those sums were payable to Purchaser upon presentment of an invoice to the Escrow Holder. Rather, Seller relies solely on the argument that when, eight months into the pending litigation, Seller submitted its application for refund claiming entitlement to the full balance in the escrow account, Purchaser had to respond to Seller's application within 30 days, or else Purchaser waived its right to complain about Seller's calculations.

The jury's finding of "waiver" was conditioned upon, and limited to, the question of whether Purchaser waived its right to contest Seller's applications for refund solely as a result of Purchaser's failure to respond to the applications within 30 days. Even if there was other evidence indicating waiver, the jury's answer was restricted to a consideration only of the fact that Purchaser did not timely respond to three applications for refund.

We note that there is no clause in the contract providing that "time is

20

of the essence."

We also consider relevant the following provision in Paragraph IV B of the Rental Guarantee Agreement:

> Furthermore, Purchaser, by any act, delay, omission or otherwise, shall not be deemed to have waived any of its rights, privileges and or remedies hereunder.

The Rental Guarantee Agreement authorized Seller to apply for a refund of excess amounts in the escrow account quarterly. The agreement allows Purchaser 30 days to review Seller's accounting, and then requires "[o]n or before the end of such thirty days, Purchaser shall do one of the following," listing three types of responses allowed Purchaser. The agreement does not specify the consequences of Purchaser's failure to respond within thirty days.

Seller argues, and the jury found, that by failing to respond within thirty days, Purchaser waived its right to contest Seller's application for refund, regardless of how erroneous they may have been. The correctness of this position depends on whether the thirty day requirement in the contract is a "condition precedent" or a "covenant." The difference is explained well in Landscape Design & Constr., Inc. v. Harold Thomas Excavating, Inc., 604 S.W.2d 374 (Tex. Civ. App. )) Dallas 1980, writ ref'd n.r.e.):

> A condition precedent is a fact which must exist before a duty of immediate performance of a promise arises. Andretta v. West, 318 S.W.2d 768, 773 (Tex. Civ. App. )) Texarkana 1958, writ ref'd n.r.e.). A covenant, as distinguished from a condition precedent, is an agreement to act or refrain from acting in a certain way. A breach of a covenant which is a part of a legally enforceable contract gives rise to a cause of action for damages rather than affecting enforceability of the provisions of the agreement. Reinert v. Lawson, 113 S.W.2d 293, 295 (Tex. Civ. App. )) Waco 1938, no writ).

                            * * *

> The general rule of delineation between covenants and conditions is set out in Hohenberg Brothers Co. v. George E. Gibbons & Co., 537 S.W.2d 1, 3 (Tex. 1976). Normally a term such as "if", "provided that", "on condition that", or some phrase of conditional language must be included that makes performance specifically conditional. Otherwise the language will be construed as a covenant in order to prevent a forfeiture. More specifically, as stated in Schwartz-Jordan, Inc. v. Delisle Construction Co., 569 S.W.2d 878, 881 (Tex. 1978), language will not be construed as a condition precedent when another reading of the contract is possible.

21

Id. at 376-77.

In view of these rules of construction, we hold that, as a matter of law, the 30 day response provision in the agreement is a covenant or a promise by Purchaser that it will respond to Seller's applications for refund within 30 days, but it is not a condition precedent to Purchaser's right to withdraw designated funds, upon invoice and notice to Seller.

We hold that the evidence was legally insufficient to support the jury's answers to jury questions five, six and seven. The undisputed evidence presented a question of law, and we hold the jury's "waiver" findings are contrary to the law and are immaterial. We sustain appellant's point of error three.

In connection with the jury answer to jury question four, we hold that Purchaser did not forfeit its right to receive the funds from the escrow account which Seller acknowledged were payable to Purchaser upon invoice and notice. Purchaser's failure to timely submit invoices to the Escrow Holder, and its alleged failure to timely contest Seller's applications for refund[5], perhaps gave rise to a claim for damages for breach of contract; however, Seller did not plead or prove it was damaged by Purchaser's failure to withdraw the money it was entitled to receive.

We hold that Seller's October 15, 1987 application for refund erroneously overstated the amount payable to Seller, as a matter of law. The evidence was legally insufficient to support the jury's answer to jury question 4(3). We, therefore, sustain appellant's point of error one.

In their eleventh point of error, appellants assert that the trial court erred in entering judgment for Seller in the amount of $1,818,069.00, because the jury's answer to jury question four, and its answers to jury question 22, 30, 31, 33, 36 and 37, fatally conflict and are irreconcilable.

In response to jury question four, the jury found that Seller was entitled to recover the full amount sought under its three applications for

---

[5] The evidence shows that Purchaser apparently did respond to Seller's third application for refund within thirty days, showing disagreement with Seller's calculations. (The first time Seller indicated Purchaser was not entitled to any of the monies in escrow, was in that third application for refund.)

22

refund, totalling $1,818,069.00. Appellants argue that this finding is inconsistent, and irreconcilable, with the following additional findings:

<u>Jury question 22 (mutual mistake)</u>: Purchaser and Seller were mutually mistaken upon execution of the Rental Guarantee Agreement in believing that, for purposes of the agreement, additional rental income would not be included as an item of income without a corresponding deduction for expenses for which the additional rental income would be reimbursement.[6]

<u>Jury question 30</u> (expense stop under Natural Resources Lease): Purchaser and Seller intended, upon execution of the Rental Guarantee Agreement, that the expense stop in Natural Resources' lease was 4.00 per square foot.[7]

<u>Jury question 31</u> (mutual mistake re: Natural Resources' expense stop): Purchaser and Seller were mutually mistaken, upon execution of the Rental Guarantee Agreement with respect to the amount of the expense stop in the Natural Resources lease for purposes of the Rental Guarantee Agreement.

<u>Jury question 33</u> (no forfeiture intended): Purchaser and Seller did not intend that the failure of Purchaser to submit an invoice within a specified amount of time would result in a forfeiture of any amounts to which Purchaser would have been entitled, for purposes of the Rental Guarantee Agreement.

<u>Jury question 36</u> (re: Hill & Parker Lease): Purchaser's renegotiation of the Hill & Parker lease was prudent and customary.

<u>Jury question 37</u> (Seller's ratification): The Seller did ratify Purchaser's conduct in withdrawing $297,261.09 out of the escrow account.

<u>Re: Natural Resources Lease Expense Stop</u>
<u>(Answers to Jury Questions 30 and 31)</u>

Appellants argue that the amounts the jury found "due" Seller in response to jury question four are further incorrect because Seller's calculations, which the jury adopted, erroneously used $.50 per square foot per year as the expense stop in the Natural Resources Lease.

Not only is Natural Resources the largest tenant in the 5300 Memorial building, occupying two full floors (31,250 sq. feet), it is also a limited partner in Seller. The difference between the $.50 per square foot used by

---

[6] Mutual mistake was defined for the jury as follows: "Mutual mistake" may arise when parties to an agreement have the same intention and understanding as to the terms to be embodied in a proposed written agreement, but in the effort to reduce their agreement to writing, both mistake its terms so that the writing does not represent the real contract. Mutual mistake is not readily established by the admissions of the parties. A mutual mistake may arise from all the facts and circumstances surrounding the parties and their execution of the instrument, as well as their conduct after the execution of the instrument.

[7] "Expense Stop" being the sum per square foot of net rentable space per year for common area maintenance and operating expenses which does not pass through to the tenant but is an obligation of the landlord.

23

Seller as the Natural Resources' expense stop, and the $4.00 found by the jury to be the intended expense stop, is $3.50. $3.50 multiplied by 31,250 sq. feet, multiplied by three years, equals $328,125.00. Appellants argue that Seller's calculations, therefore, erroneously overstate the amount of Seller's refund due from the escrow account by an additional $328,125.00, according to the jury's answer to jury question numbers 30 and 31.

the Rental Guarantee Agreement states that the "expense stop" is determined by the "sum specified in each Project tenant lease." The Natural Resources lease provides that the expense stop (the amount of expenses that remains the obligation of the landlord, and is not passed through to the tenant) is 50 cents. However, the rent roll and estoppel certificate provided by Seller in connection with the sale of the building listed the expense stop for Natural Resources at $4.00. Seller claims this was a clerical error, and that the true expense stop is 50 cents.

The jury found that the parties intended, upon execution of the Rental Guarantee Agreement, that the expense stopped specified in the Natural Resources lease was $4.00 per square foot of net rentable space per year.[8] The jury further found that the Purchaser and Seller were mutually mistaken with respect to the amount of the expense stop in the Natural Resources lease.[9] Purchaser was therefore entitled to have the rental guarantee agreement construed and enforced in accordance with the true agreement of the parties. See Thalman v. Martin, 635 S.W.2d 411, 413 (Tex. 1982).

We agree that the jury's answer to question number four, which adopted Seller's applications for refund based on a .50 expense stop for the Natural Resources lease, conflicts with the jury's findings that the parties intended to use a $4.00 expense stop and were mutually mistaken with respect to the amount of the expense stop in that lease.

---

[8] Response to Question 30.

[9] Response to Question 31.

24

<u>Re:  Hill & Parker Lease</u>
<u>(Answer to Jury Question Number 36)</u>

Appellants next argue that Seller's applications for refund further erroneously calculated the amount "due" by including the amounts which would have been paid by Hill & Parker under their old lease, rather than under the existing, renegotiated lease.  It is uncontroverted that, like Natural Resources, Hill & Parker is also a substantial tenant in the 5300 Memorial building; it occupied 15,625 square feet in June 1985.  Members of the law firm are also limited partners in Seller.  Effective September 1, 1986, the Hill & Parker lease was renegotiated, with Purchaser to provide additional space and a longer term, in exchange for certain rental concessions.

The Rental Guarantee Agreement required Purchaser to "manage the project in a manner which is considered customary and prudent among managers of office buildings of similar size and quality in the Houston area."  The jury found, in response to Question 36, that the renegotiation of Hill & Parker lease was prudent and customary.

Despite the fact that the renegotiation of the Hill & Parker lease was found to be prudent and customary, Seller calculated the amount "due" it in its applications using the old Hill & Parker lease, rather than the existing, renegotiated lease.  According to appellants, the difference between Seller's refund from the escrow account as shown by the applications using the old lease, versus calculations using the existing, renegotiated lease, is $324,667.66.

Seller responds that a separate Cross indemnity Agreement between Seller and Purchaser prevents Purchaser from benefitting from the renegotiated lease in this way.  We disagree.  In our opinion, a prudent and customary renegotiation of a lease involving limited partners in Seller is not the type of "act" covered by Purchaser's agreement to indemnify the Seller from "liabilities, losses, damages, costs, and expenses."

We conclude that there is a conflict between the jury's answer to question 36 and the jury's answer to question four which adopted Seller's

25

calculations using the old Hill & Parker lease.

We further conclude that the answer to jury question four is inconsistent with the answers to jury questions 22, 33 and 37.

A court may not strike down jury findings on the basis of irreconcilable conflict "if there is any reasonable basis upon which they may be reconciled." See Luna v. Southern Pac. Transp. Co., 724 S.W.2d 383, 384 (Tex. 1987); Bender v. Southern Pac. Transp. Co., 600 S.W.2d 257, 260 (Tex. 1980); Roach v. Roach, 735 S.W.2d 479, 482 (Tex. App. )) Houston [1st Dist.] 1987, no writ). The presumption is always that the jurors intended their answers to be consistent. See Huber v. Ryan, 627 S.W.2d 145, 146 (Tex. 1981); Woodyard v. Hunt, 695 S.W.2d 730, 732 (Tex. App. )) Houston [1st Dist.] 1985, no writ).

A conflict is fatal when, ignoring the conflicting findings and taking into consideration all of the remainder of the verdict that is supported by the evidence, the resulting judgment would necessarily be different from that which the court has entered. Little Rock Furniture Mfg. Co. v. Dunn, 222 S.W.2d 985, 991 (Tex. 1949); Straite v. Krisman, 737 S.W.2d 80, 82-83 (Tex. App. )) Houston [14th Dist.] 1987, no writ); Smith v. Washburn, 721 S.W.2d 453, 455 (Tex. App. )) Tyler 1986, no writ). Appellants argue that, disregarding the jury's response to Questions No. 4, and taking into consideration all of the remainder of the verdict (without considering the usury claim), Seller is entitled to only $602,795.00, rather than the $1,818,069.00 found in response to Question No. 4.

Appellees respond that, in view of the other jury findings considered as a whole, the jury's answers are completely consistent. Appellees point specifically to the following additional jury findings:

Jury questions 5, 6 and 7 (waiver by Purchaser): Purchaser, by failing to respond within 30 days to Seller's Applications for Refund dated December 22, 1986, July 31, 1987 and October 15, 1987, waived its right to contest Seller's Applications for Refund.[10]

---

[10] These were the three Applications for Refund listed in jury question No. 4, the damage issue complained of. We note that in response to jury question No. 43, the jury found that the Purchaser is not estopped from asserting that it is entitled to contest the same three Applications for

<u>Jury question 40</u> (ratification by Purchaser):  Purchaser, despite any alleged fraud or mistake, ratified the Rental Guarantee Agreement.

<u>Jury question 41</u> (laches):  Purchaser delayed for an unreasonable length of time before asserting a mutual mistake or a unilateral mistake or any ambiguity in connection with the Rental Guarantee Agreement, and Seller was disadvantaged by such delay.

Appellees argue that the jury's findings of (1) mistake, (2) lack of interest to forfeit, (3) ratification of Purchaser's withdrawal, and (4) prudent renegotiation of the Hill & Parker lease, are all superseded by the findings that the purchaser (1) ratified the mistaken contract and (2) waived its rights to contest the applications for refund filed by Seller.

We agree that, if the evidence supported the jury's findings against Purchaser of waiver, ratification and laches, then the jury's answers would not be in fatal and irreconcilable conflict.  However, such is not the case.

As already discussed, we find the evidence is legally insufficient to support the jury's "waiver" findings.  Additionally, we find that the evidence is legally insufficient to support the jury findings of ratification and laches, as asserted by Appellants in points of error six and eight.

The jury was instructed that

"ratification" occurs when a party, after entering into a contract because of fraud or mistake, continues to accept benefits under the contract after he became aware of the fraud or mistake or conducts himself in such a manner as to recognize the contract as binding.

On December 22, 1986, Seller submitted its first application for refund. Purchaser apparently did not agree with Seller's figures, causing Seller to file suit approximately two months later, on February 26, 1987.

On March 2, 1987, Purchaser informed Seller in writing that, according to Purchaser's computations, Seller's application for refund was almost $900,000.00 too high.  Additionally, in March 1987, Purchaser filed a general denial of Seller's claims in its lawsuit.

The evidence is undisputed that, from and after the first indication

---

Refund; however, appellant does not complain that this answer conflicts with the answers to jury question Nos. 5, 6 & 7 re: waiver.

that Purchaser and Seller were making their computations differently as a result of their interpreting the Rental Guarantee Agreement differently, Purchaser did not withdraw any further funds out of the escrow account. Because Purchaser did not benefit from the account after the discrepancy was apparent and the dispute arose, we hold that as a matter of law, Purchaser did not "ratify" that part of the written agreement that the jury found did not reflect the true agreement of the parties as a result of mutual mistake. See Spellman v. American Univ. Inv. Co., 687 S.W.2d 27, 30 (Tex. App. )) Corpus Christi 1984, writ ref'd n.r.e.).

For the same reasons, we find the evidence is legally insufficient to support the following jury finding on laches:

## Question No. 41

Did San Jac Financial Services (Purchaser) delay for an unreasonable length of time before asserting a mutual mistake or a unilateral mistake or an ambiguity in connection with the Rental Guarantee Agreement and that 5300 Memorial (Seller) was disadvantaged by such delay?

Answer: Yes

Again, according to the evidence, the first indication of a difference of "interpretation" of the Agreement by Seller and Purchaser occurred as a result of Seller's December 22, 1986, application for refund. Within approximately two months of receiving Seller's application, Purchaser made it clear to Seller that Purchaser construed the contract substantially differently. Seller filed suit, and Purchaser contested Seller's claim. The fact that Purchaser did not specifically identify the bases for its contest in terms of "mutual mistake", "misrepresentations", "ambiguity", etc. until Purchaser filed its counterclaim in December, 1987, is a matter governed by the Texas Rules of Civil Procedure. The equitable doctrine of "laches" does not apply to pleadings and pre-trial conduct of parties after litigation has been instituted.

We sustain appellants' points of error six, eight, and 11. We find that the jury's answer to jury question four is a specific finding that is in fatal

28

and irreconcilable conflict with the specific findings in response to jury questions 22, 30, 31, 33, 36 and 37. Accordingly, the judgment must be set aside and the cause remanded for a new trial. <u>Straite v. Krisman</u>, 737 S.W.2d at 83-4.

In view of our disposition of the points of error already discussed, it is not necessary for us to rule on the remaining points of error and cross points, and we decline to do so.

The judgment is reversed, and the cause is remanded.

<u>/s/ Margaret Garner Mirabal</u><br>
Margaret Garner Mirabal<br>
Justice

Justices Bass and Cohen also sitting.
Do not publish. Tex. R. App. p. 90.

Judgment rendered and opinion delivered
True Copy Attest:

_____
Kathryn Cox
Clerk of Court

29